Number 17-1317. Mr. Larson, you reserved three minutes of your time for rebuttal, correct? Yes, sir. Okay, now you may proceed when you're ready. Thank you, Your Honors. May it please the Court, my name is Joshua Larson. I'm here today representing the appellants Knauf Insulation, Inc. and Knauf Insulation SBRL, the patent owners, in this appeal from the Patent Trial and Appeal Board. This case arose from several re-exams involving three of Knauf's patents. Your Honors, according to the Board's logic in this case, the Board believed that it would be obvious to combine basically any and all teachings from prior art references solely because they had an overlap in intended use or application, and regardless of what the references actually taught about how they achieved that result, no matter how different that was and how different the systems were. More particularly in this case, each of the Board's obviousness rejections rely on a primary reference, I'll refer to as Hansen, in the briefs we call it Hansen II, but for shorthand Hansen today, and a secondary reference, Worthington. Some of the rejections also rely on first, fourth, or fifth tertiary references. But the core of the rejection in this case, in the 103 rejections that we've appealed, is that the primary reference, Hansen, would have been modified by a teaching in Worthington to arrive at the claimed invention. And Your Honors... Let me clarify this for me, because the way you started out struck me as being possibly an overstatement of what the Board was really doing here. You say all that was required under the Board's logic was an overlap of, I think you said, intended use and application. But isn't it the case that the two prior art references and the patents all have a lot in common in terms of their components that go into the ultimate composition here? And that departures are only with respect to a couple of the components. That seems to me quite different from saying that if you have an intended use of one quite different set of components from another, that they're prima facie combinable. Your Honor, we would respectfully disagree with that characterization. I believe that is one of the characterizations that the PTO has advanced on appeal here, is that these two references have a lot of similarities. And in the sense of if you were to go through and just pick out several of the reactants that we have in our claims, you can go through these references and find those reactants. But isn't that important to deciding whether it makes sense to look to the other references for guidance and motivation to combine? I believe it is important to look at the references, Your Honor, and that's the point I'd like to make. But I mean, the similarity between the references is an important factor. But go ahead. I agree with you, Your Honor, that if there were a similarity between these references, that would be a factor that could point towards obviousness. But in our view, there is very little similarity. They are similar in the sense that they are both binder systems or binder chemistries, and the overlap in potential uses that they could be used on sand. That's what the PTO had pointed out. But what the PTO has ignored in its decision is the very different chemistries that are involved in the two references and our claim. In each of these three, we have a different system going on, a different type of reaction, different chemistries. In our claim, in the first instance, we've claimed a Maillard reaction. That is, the product is called a melanoidin, and that's what's used as the binder. In Hansen, by contrast, Hansen does not describe that reaction. It describes a different type of chemistry that involves anhydrides. There's a two-step reaction that happens. While some of the same reactants are involved, they're reacting in a different order in a very different way to produce a different product. They produce polyesters, and the polyesters are used as the binder in Hansen. It's a different type of binding system. Then in the third instance, we have Worthington. Again, while some of the same reactants are mentioned, they're present in very different proportions and reacted in different ways and in different orders to produce a different type of binder. Worthington is a little bit vague on what his binder is, but to our best understanding, he dehydrates sugars and uses the dehydrated or caramelized sugars as a binder. And so, Your Honor, in this case, what we don't—this is not a case where we have two references that describe the same or even closely related reactions, and the PTO has just said we need to take the amounts. It would be obvious to take an amount from one and tweak it in the other. If we were to agree with the board's inherency finding with respect to finding that Hansen does have the Maillard reaction, if we were to agree with that, how does that impact the argument that you're making before us now? Because I noticed that you led with that, but I know that the board also found inherently that the Maillard reaction was occurring. Yes, Your Honor. So the history—if I may, just to answer that question, a bit of the history in this case, how we got here. The first rejection that was proposed by the re-examiner classroom that the examiner initially adopted was a 102 rejection based on Hansen. And our claims at the time that they were rejected did not have any amounts of the various components in it. They were similar to the claims that were present in the last appeal that was before a panel involving Judge Reyna last year. We've since amended those claims to overcome that inherency rejection that we received, because the rejection based on Hansen—Hansen, too, did not explicitly teach this Melanoid or Maillard chemistry, but the rejection was basically there would be a side reaction that would be happening. It's undisclosed, and it would be present in small amounts, but the rejection was that it would be present. Well, we disagreed with that. We decided to amend the claim to put in these amounts to claim more specifically— this is not—we're not talking about trying to claim a side reaction. We're claiming specifically this is the main reaction that's taking place, the proportions of the reactants present to get the claims that we have now on appeal. What the PTO did in response, when we amended those claims, was it took—it went and found this Worthington reference that specifically taught the amount of carbohydrate we now claim, the 73 to 96 percent, and it proposed that it would modify the allegedly inherent side reaction in Hansen to modify that based on the 73 to 96 percent to arrive at our claims. So to answer your question, Your Honor, even if the panel were to agree that that reaction did take place or was inherent in a side reaction, we're not just talking about an anticipation context here. We're saying the board's reasoning is that it would have been obvious for a person of skill in the art, that a person of skill in the art would have been motivated at the time of the invention based on an inherent side reaction that's not explicitly taught in Hansen to modify it based on another reference, Worthington, that teaches a completely different type of chemistry, both from Hansen's primary teachings and this inherent side reaction. And, Your Honor, we believe that that is improper under 103, under cases like Honeywell from last year and cases that say in the obviousness context, adherency really must be circumscribed and things that are inherent are not obvious. Again, the PTO is talking about a person of skill looking to some inherent side reaction and wanting to then go and have some motivation to optimize that based solely on a teaching and another reference that teaches that a certain amount of carbohydrate might be good for a different type of binder. Asking you, moving to a different topic for a minute, Worthington, it does say that having a certain amount of carbohydrate is preferred. Is there anything in the record that you're aware of for why it's preferred or do you have a view on that? Your Honor, in the record, to our knowledge, there is not anything in the record about why it's preferred and that's one of the issues that we believe also shows the obviousness combination here is improper because the PTO pointed to that statement about preferred in Worthington as reasonable. Why would you pick out that teaching? And they say, well, it says it's preferred. And our response to that would be, preferred for what? The reference doesn't say why it's preferred. To the extent that one were to infer what it's preferred for, it would be preferred for the binder system of Worthington. Again, this binder system that involves dehydrating sugars as a binder. Just because a teaching is preferred for one type of reference, one type of chemistry, does not mean that it would be preferred for another type of chemistry. If I understand correctly, this is why the board then said in response, well, these are both thermoset binders and these are both binders that are used for these same purposes and there's other similarities and that's where all of this discussion of similarity comes from. They're saying because Worthington says it's preferred and these are so similar, it would have been preferred also. One of ordinary skill in the art would have been motivated to modify the primary reference in view of the teaching that is preferred in the secondary reference. If that's the reason why they got into that, I think, not because you're arguing that these references are not analogous or anything. Is that right? That's correct, Your Honor. We have not specifically advanced a non-analogous art argument here. The focus has more been, from our point of view, on what's the motivation in the first place. What's the motivation to take that teaching from Worthington and apply it? The chemistries are significantly different. Again, we're not talking about modifying the reaction that Hansen 2 explicitly described. We're talking about supposedly modifying an undisclosed, supposedly inherent side reaction and what's the motivation to do that. With regard to the similarities, Your Honor, in our view, in terms of an analogy here, the rejection is similar to if we were looking at maybe the pharmaceutical context and just using two basic drugs like acetaminophen and ibuprofen. They both may be used. They're both drugs. They're both taken orally. They both are used to treat headaches in many cases. But just because those two drugs have a similar application does not make it obvious to pick and choose any teachings about one and apply them to the other. They're very different drugs in terms of the actual chemistry that makes them up, what their modes of action are in the human body. And that's evidenced by the fact that you have people who are extremely allergic to one or the other, that it's safe for them to take one and not the other. The two things are not the same just because they're used for similar purposes. Just because we have two binders here that may be used to bind sand, the actual differences in how those references work show why the art is very different when they've been combined. In the same vein of the PTO ignoring what the actual teachings of those references are, we've pointed out briefly that not only is there a lack of a link between the two, but the two references actually teach away from their combination. In the first case, you've got Hansen, and Hansen does teach a system in which an acid, an amic acid specifically, that would not be able to participate in a Maillard reaction, is reacted with a carbohydrate and they produce their binder from that. Hansen specifically says that you can use up to 40% carbohydrate in his binder, gives several examples. But beyond that, the examples given show that the properties of the binder, specifically its delamination strength, how well it holds. Did you make this argument to the board? Yes, Your Honor, we did. We specifically pointed out to the board that Hansen only provided for carbohydrate percentages. But you didn't make that delamination argument before the board, right? Not in the same detail that we have here, Your Honor, but we were advancing that same argument that Hansen too teaches away from the combination because of its focus on limiting the amount of carbohydrate that's present. And so in that sense you have Hansen, which teaches that it uses a limited amount of carbohydrate, and the board's reasoning there, the PTO's reasoning was, you would take this reference over here teaching a different type of chemistry, Worthington, that has a high carbohydrate percentage, it's more of a carbohydrate-focused chemistry, and apply that, just apply that to Hansen regardless of the fact that Hansen says use up to 40%. In response to that, the board said, well, even though it teaches up to 40%, there's nothing in it that says you can't use more. And in our view, that's backwards, Your Honor. There has to be a motivation. You're into your rebuttal time. You can continue on and use it up or stop now. I would like to save the remainder of my time for rebuttal. Thank you, Your Honor. Counselor Hunt? Good morning, Your Honor. Please, the Court. Worthington and Hansen, too, are very similar references. They are directed to the same primary reactants. They have similar processes. They are directed to overcoming the same problem of finding an economical binder solution, and they bind similar components to include the same component of foundry sand. How do you respond to the argument that one of them is more in a powder form and one of them is in a liquid form? I think it's Hansen's in a liquid form and Worthington's in more of a powder form. Well, Worthington does have the embodiment that allows for a precondensate aqueous solution. So while some of the embodiments of Worthington are in a powder form, in at least one embodiment, Worthington does have an aqueous solution that's similar to the aqueous solution Hansen. It's the amine and the carboxylic acid added together with water first, and then it's still down a little bit, but it's still 60 to 40 percent water, and then that's added together with the carbohydrate and the sand. So the only real difference is when the carbohydrate's added. Do you add that first to the solution, or do you add it with the stuff that you're trying to bind, which isn't that much of a difference. Your opposing counsel says that these are two entirely different chemical reactions, and you've just said they're not. Can you help us try to figure out which of you is right? Sure, and I will do that. Because there wasn't a whole lot in the briefs. But I will say that I think that's waived, because I think that's why there's not a whole lot of discussion about it in the board's decision, because that's not – just to the extent that these are such different reactions, really they argued before the board that Hansen binds elongate materials like fibers, and Worthington binds sand, and that's why one wouldn't combine them. But in terms of whether – Was there in fact no discussion of the difference in the reactions between Hansen and Worthington? I guess it depends on for what portion of the decision. So there was certainly a discussion in the question of the Hansen-Worthington water teaching away. There was some discussion of is that sufficiently different. So in that context, yes, there was. In the context of is the carbohydrate level teaching away, there was not a discussion of those examples, as the court noted, but there was just – there wasn't much of a developed argument on that point. And on the – are these such different reactions, in the inherency analysis that was – for the arguments that were actually made on inherency, on whether or not there would be sufficient alkanol amine available after the pre-reaction in Hansen-2, that was made, but there was not an argument that, well, this is – these are entirely different chemical reactions made to the board. In terms of whether they're different, the Hansen-2, until now, I'm not sure that there was much of a dispute of whether Hansen-2 inherently teaches melanoidins. Hansen-2, for NAWF, I'm sort of comparing to NAWF and then the two references. So NAWF has everything except for the exact carbohydrate proportion of dry weight, and it has – and whether the melanoidin reaction is there. There's no limit to the amount of melanoidins present in the claim. So it doesn't matter if there's some other reactions also happening, as long as you have the reaction that produces melanoidins also happening for the purposes of this claim. And the may-iron reaction, there isn't a whole lot of discussion about what it is, but there is in the specifications somewhat of a detailed analysis of what it is. But, I mean, it's adding a carbohydrate to an amine and usually heating it. It's what happens when you make bread. It's what happens when you brown steak. It seems like a very complicated thing, but it's something that is well-known, and that for long periods of time, if you add an amine and you add carbohydrate, everybody – people have known, it browns and you create a melanoidin. So that's what's going on in Hansen, even if other – Hansen-2, even if other things are going on. In Worthington, in terms of exactly how that chemical reaction unfolds, Worthington, as our council admitted, is a little unclear about that. It sort of says the reactions taking place are complex and not thoroughly understood, column 2, line 50. But given that they have the same reactants and it's likely that – and there's heat applied, there may very well be a may-iron reaction taking place. But the board and the examiner didn't rely on Worthington for teaching inherent production of a may-iron reaction. It relied on it simply to say one could have a binder that's – with similar reactants, similar reactions, where the carbohydrate level, the dry weight of carbohydrates is a little bit higher. And what's interesting, too, is the molar ratios of acid to carbohydrate are taught in Hansen-2. And one would expect for chemical reaction purposes that the molar ratios are the more important thing. That's not even what Worthington is relied on for. It's relied on for just the dry weight. Increasing the dry weight. The dry weight. So Worthington says that that particular percentage for carbohydrate is preferred, but doesn't say why it's preferred. Does the government have a position on why it's preferred, or is that in the record anywhere? And is that required? Those are three good questions. I'll try to end with is it required and start with is it in the record. Worthington doesn't say anywhere explicitly why specifically the carbohydrate proportion is what it is. It does say what the advantages of the binder overall are, which are that it's more economical than priorite binders. It doesn't have fumes. It's easy to prepare. One can tease out a little bit from Worthington because Worthington talks about the acids being expensive potentially, and it talks about the amines being useful for strength, but you don't get any strength advantages from having more than 5% dry weight of amines. So from reading that, I would expect that the carbohydrate percentage is probably somewhat cheaper, but it doesn't because the whole advantage of the binder is an economical binder, and some of the other components, the advantages of those components are listed, while the carbohydrate may not be specifically listed. But where the binders are so similar, that is a fair variable to look to. Going back to is that required, if we go back to KSR, we have one technique that's being used to improve one device or one product, and it would be expected to use that technique in a similar product unless it's beyond the skill and the art. There's no allegation here that it's beyond the skill and the art. As my friend mentioned, this limitation was added after re-exams, where there's not a whole lot of discussion in the specification of why it even matters in now subvention. It seems it's mainly added to distinguish, and for some variable that you could somehow distinguish the prior art. The specification is really about the Maillard reaction, and doesn't suggest that there's any real meaning to having a higher or lower dry weight of carbs. The initial claims didn't have those limitations whatsoever. So I think that the advantages overall of the binder of Hansen can be imputed somewhat to the carbohydrate range, but beyond that, I don't think it's required here, where you have sort of like the two brake systems, you have a whole bunch of well-known options where you could really do it one way or the other way, and it doesn't seem to particularly matter too much which one you choose. Maybe they don't have any advantages. Maybe there isn't a real known advantage to using that level of carbohydrate dry weight versus the slightly lower level of carbohydrate dry weight. You could really pick either one, and that's what the record indicates here. You have Hansen 2, which has everything in claim except for the slightly lower dry weight of carbohydrates, and then you have Worthington, which does have a substantial amount of similarities, and you have that slightly higher dry weight preferred. Again, this is not in the record, but I suspect that carbohydrates are cheaper than acids and amines, and that the cheaper rationale is the rationale of both of those references, especially Worthington. Moving on to some of Hansen's other points. Again, on the teaching way of Hansen 2 for carbohydrate levels, there's nothing in Hansen 2 that suggests that higher carbohydrate levels weights would be unsuccessful. Am I correct in understanding that the tables that were being compared there in the delamination argument were comparing no carbohydrate at all versus a set amount of carbohydrate? Yes, so if you get to that argument, which we argue was waived, but if you get to that argument, that's all they're doing, is they're comparing no carbohydrate to one single set amount of carbohydrate. So they don't show anything about increasing levels of carbohydrate. They also don't show anything about a higher level of carbohydrate. They just have the one level of 25%, which is within the Hansen 2 range, and they show that in some respects, but certainly not in all respects, the binder that lacks any carbohydrate is in certain respects stronger. But even that is overstated because the table shows that the binder with carbohydrates actually has a higher initial strength and a higher strength after aging in the climate change burn and after the other delamination tests performed. Hansen 2 teaches using carbohydrates. If Hansen 2 were to find that carbohydrates were weak, why would it claim using carbohydrates? The whole point of Hansen 2 is to use a formulation that includes carbohydrates. So there really is no teaching away in Hansen 2 of using carbohydrates or even using higher levels of carbohydrates. It teaches to use carbohydrates. You think that the discussion of putting no more than 40% or not that it's no more than 40%, but that's not a limitation, it's just an example? Well, Hansen does earlier on, not in the examples, say that for most applications, it uses 40% or less and preferably 5% to 40% of carbohydrates. But there's nothing that discourages from using more or suggests that using more wouldn't work or using more would not have a desirable outcome. Not that it's necessarily required, but there's nothing that suggests that using more would render the binder inoperable either. It's just what it used. We wouldn't have any obviousness cases if that were a teaching away, since you're always claiming something. And the thing that you're not claiming is simply the fact that you're not claiming it or you're saying it can't be itself a teaching away. For Worthington 2, in terms of the water, we discussed that somewhat, but there is the embodiment that uses a substantial amount of water. And while there's a lot of complicated jargon, it's still fairly simplicated. It's still a very simple reaction. It's adding the carbohydrate to the acid, mixing that up with water, and then putting in the saline and the carbohydrate and then anything else that you might add. You might add some cross-linking agents. You might add some of the other components at that point if you chose to do so, like the coupling agents that are in some of the non-disputed claims. I guess beyond that, on the inherency question, I'm not sure how interested the court is in that, but it really is waived beyond the arguments that they made below. And their arguments below were very specific, and the board addressed those arguments. The reason that the board didn't talk about a lot of the things that they talk about here now is because they weren't raised at the board. So it's not unusual for the board not to discuss them because they were undisputed issues. For inherency, the board addressed the argument that alkanol amines and that there would be insufficient alkanol amine after the first reaction enhanced into to react with the carbs to produce a melanoid reaction. That's not the argument they're making here. The board addressed the argument that other things would be present, which they brought up in another context here, that other things would be present enhanced into other reactions going on so that we can't think that a Maillard reaction would have taken place. They said, no, it doesn't matter that there are other things also going on. All you need is the melanoidins. In terms of the new inherency argument that's being made, Hansen 2 teaches inherence production of melanoidins. One of ordinary skill in the art, and I actually didn't hear them talk about it, but one of ordinary skill in the art wouldn't understand to keep the molar ratio of Hansen 2 the same by adding acid to maintain a ratio. And even if one of ordinary skill in the art wouldn't understand that, we calculated out molar ratios that would still meet the molar ratios of the claim even if you just increase the dry weight of carbohydrates. That's something that really should have been before the board and before the examiner. Can we thank you? Mr. Larson, you have close to two minutes. Thank you. So one of the discussion points that we talked about and my opposing counselors talked about was the similar components and whether or not these references had similar reactions. That was something that we argued about below. It was in the context of whether or not primarily Hansen and whether or not there would be this inherent production of melanoidins because the board relied on the allegedly identical or nearly identical chemistries between our claim and Hansen to determine, in their view, that there would be production of melanoidins. We have disagreed with that and been pointing out the differences between Hansen and our chemistry all along. The issue of the similarity between Worthington and Hansen was not discussed extensively below because the PTO never relied on that as a basis for its obvious miscombination. The examiner's sole statement was that the two references were used to bind similar composite components and that was the same analysis relied on by the board. They didn't rely on the alleged similarity. We disagree completely with that alleged similarity, but that wasn't the rationale used by the board and that can't be the rationale that the PTO uses today to defend that decision when it wasn't even part of the decision. Finally, on the issue of the molar ratios that my opposing counsel just mentioned, we've also argued that the proposed combination doesn't even arrive at the invention. The board never engaged, and the PTO never engaged, in an analysis of this combination of these references. They said, well, you just take Worthington's carbohydrate percentage, apply it to Hansen. But again, we're talking about an undisclosed, allegedly inherent side reaction in Hansen. And so I heard my counsel's argument, opposing counsel's argument, PTO's argument, one of the skill in the art would have known to take those molar ratios. Those molar ratios aren't disclosed in Hansen. That's something that the requester in this case and the PTO came up with using their own calculations. And so again, this undisclosed reaction, the board is saying it would be obvious to modify that based on the different chemistry of Worthington. We submit that that is not a proper basis for obviousness. Thank you. Okay, thank you.